UNITED STATES
v.
**FORRESTER** et al.
No. 1078.

United States District Court
W. D. Arkansas, Fort Smith Division.
Feb. 9, 1954.

Charles W. Atkinson, U. S. Atty., David R. Boatright, Asst. U. S. Atty., Henry M. Britt, Asst. U. S. Atty., Fort Smith, for plaintiff.

J. R. Crocker, O. E. Williams, Fayetteville, for defendants.

JOHN E. MILLER, District Judge.

This case was tried to the court on ore tenus testimony February 3, 1954. Prior to that date, the able attorneys for the respective parties had filed exhaustive briefs in support of the contentions of the parties. At the conclusion of the testimony, the case was submitted and taken under consideration and now, having considered the pleadings, the ore tenus testimony and exhibits thereto, the stipulations of the parties and the briefs heretofore filed herein, the court makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

Findings of Fact

1.

The plaintiff is the United States of America. The defendants, Robert G. Forrester and Cora L. Forrester, his wife, are citizens of Arkansas and reside on their 77-acre farm near Fayetteville in Washington County in the Western District of Arkansas.

The defendant, Farm Bureau Cooperative Mill & Supply, Inc., commonly known as Farm Bureau Cooperative, is a cooperative association organized under the laws of the State of Arkansas, with its principal place of business in the City of Fayetteville in Washington County, Arkansas. The defendant, Swift & Company, is a corporation organized and existing under the laws of the State of Illinois and authorized to do business in the State of Arkansas.

In view of the issues that were tried, no further reference will be made to the corporate defendants.

2.

On April 15, 1948, the defendants executed their promissory note in the principal sum of $6,050 payable to plaintiff acting by and through the Administrator of the Farmers Home Administration, with interest on the note at the rate of 3½ per cent per annum. The note provides for the payment of principal and interest in installments of $283.32, beginning on March 31, 1949, and on the same date for the next succeeding thirty-nine years.

The note further provides:

"Upon default in the payment of any installment when due, or upon breach by the maker of any of the covenants and agreements on his part to be performed under the mortgage or deed of trust which secures this note, or under his loan agreement with the government or of any of the terms or conditions thereof, the holder, at its option may declare the entire indebtedness to be due and payable.

"This note is given as evidence of a loan to the maker hereof by the government pursuant to the provisions of the Bankhead-Jones Farm Tenant Act, as amended, and is subject to the provisions of that Act and to all of the provisions of the maker's loan agreement with the government, and of the mortgage or deed of trust, which secures such indebtedness." (Plaintiff's Exhibit No. 1.)

At the trial the plaintiff offered in evidence the loan agreement and, upon objection thereto by defendants, the court suggested that, since the mortgage sued upon was executed subsequent to the loan agreement, the mortgage superseded the provisions of the loan agreement, and the plaintiff thereupon withdrew his offer of the loan agreement in evidence.

To secure the payment of the note, the defendants on April 23, 1948, executed, acknowledged and delivered to plaintiff a real estate mortgage upon a 77-acre tract of land therein specifically described. The land had previously been acquired by the defendants by warranty deed from the former owners, which deed was recorded simultaneously with the mortgage.

The mortgage was recorded in the Office of the Circuit Clerk and Ex-Officio Recorder of Washington County, Arkansas, on the same date of its execution and now appears of record in said office in Record Book 399 at page 337. (Plaintiff's Exhibit No. 2.)

On January 22, 1952, the plaintiff, acting through J. V. Highfill, State Director for Arkansas of Farmers Home Administration, mailed to defendants "Notice of Acceleration of Indebtedness and Demand for Payment." This notice was received by defendants on the next day, January 23, 1952. The notice stated:

"You have breached your obligations under said note and mortgage by failing to personally and continuously use the property as a farm and for no other purpose; by encumbering the property by allowing a judgment to be taken

against you by the Farm Bureau Cooperative Mill & Supply Company; by failing to pay the 1949 taxes before they became delinquent while you were in a position to do so; by failing to maintain continuous insurance on the improvements upon the mortgaged property; by leasing part of the property to Bruce M. McMullen during 1949 and 1950."

Demand was made for the payment of the alleged balance due on the note. (Plaintiff's Exhibit No. 5.)

At the time the notice of acceleration and demand for payment was made by plaintiff, the defendants had made all payments under the terms of the promissory note and had paid all taxes and insurance premiums. However, the statement introduced by the plaintiff as Exhibit No. 4 disclosed, according to the testimony of Howard Martin, Chief Accountant for Farmers Home Administration, that defendants owed plaintiff $1.60 for which no bill or statement had been rendered. An examination of the exhibit discloses that this charge was evidently made to cover the cost of a certified copy of the judgment against defendants as mentioned by Mr. Highfill in the notice of acceleration and demand for payment.

The instant suit was filed by plaintiff on May 29, 1952. In the meantime, following the receipt of notice of acceleration, the defendants had paid on March 24, 1952, the installment of $283.-32 that was due, according to the terms of the note, on March 31, 1952.

The plaintiff in its complaint alleged the execution and delivery of the note and mortgage by defendants and the provision of the note giving the holder its option to accelerate the payment of any balance due on the note, and that the defendants had defaulted, breached and violated certain covenants and conditions of the mortgage.

The covenants and conditions alleged by plaintiff and upon which plaintiff based its notice of acceleration are set forth in the complaint as follows:

"*Clause 1*—To pay, before the same shall become delinquent, all taxes * * * and encumbrances of every nature whatsoever which affect said property or Mortgagee's rights and interests therein under this mortgage or the indebtedness hereby secured, and promptly to deliver to Mortgagee, without demand, receipts evidencing such payments.

"*Clause 2*—Immediately upon the execution of this mortgage, to provide, and thereafter continuously to maintain, fire insurance policies and such other insurance policies as Mortgagee may then or from time to time require upon the buildings and improvements now situate or hereafter constructed in or upon said property * * *.

"*Clause 3*—Personally and continuously to use said property as a farm, and for no other purpose; at all times to maintain said property in proper repair and good condition; * * * promptly to effect such repairs to said property as Mortgagee may require; to institute and carry out such farming conservation practices and farm and home management plans as Mortgagee shall, from time to time, prescribe; * * *.

"*Clause 6*—That the indebtedness hereby secured was expressly loaned by the Mortgagee to the Mortgagor to enable the Mortgagor to purchase * * * said property * * * and that Mortgagor did or will use said monies for the foregoing purposes.

"*Clause 7*—That Mortgagee, its agents and attorneys, shall have the right at all times to inspect and examine said property for the purpose of ascertaining whether the security given is being lessened, diminished, depleted, or impaired, and if such inspection or examination shall disclose, in the judgment of Mortgagee, that the security given or property mortgaged is being lessened or impaired, such con-

dition shall be deemed a breach of the covenants of the mortgage.

"*Clause 13*—That should Mortgagor * * * lease * * * or encumber said property or any interest therein, voluntarily, involuntarily, or otherwise * * * or fail to keep, perform, and comply with any covenant, warranty, or condition in this instrument without the consent of Mortgagee * * * Mortgagee may declare the amount unpaid immediately due and payable and thereupon exercise any remedy provided herein or by law.

"*Clause 20*—That time is of the essence of this mortgage and of the note and other instruments herein referred to and * * * (or) should Mortgagor fail to keep or perform any covenant, condition or agreement herein contained or referred to, then in any of said events Mortgagee is hereby irrevocably authorized and empowered, at its option and without notice and without affecting the lien hereby created or its priority or any right of Mortgagee hereunder, (1) to declare the entire indebtedness herein secured immediately due and payable and to foreclose this mortgage in the manner hereinafter set out * * *. All monies advanced or expended by Mortgagee as herein provided, including the costs of evidence of title to and survey of said property, reasonable attorney's fees, court costs, and other expenses incurred in enforcing the provisions hereof, with interest at three and one-half percent (3½%) per annum until paid, shall become a part of the indebtedness herein secured and shall be payable by Mortgagor to Mortgagee immediately after such expenditure and without demand, in lawful money of the United States, at Fayetteville, Arkansas, or at such other place as Mortgagee may designate.

"*Clause 21*—That Mortgagee may foreclose this mortgage in a court of competent jurisdiction in accordance with the laws made and provided therefor and existing at the time of said foreclosure."

### 3.

The answer of the defendants was filed on April 12, 1952, in which they admitted all allegations of the complaint except that they denied that they had failed and refused to pay the taxes as alleged by plaintiff and denied that they had failed to pay all insurance premiums as required by the terms of the mortgage.

They further alleged that they had in good faith expended from their own funds more than $2,000 in repairs and improvements of the property and had improved the pastures and other parts of the farm not included in the pastures. They also denied that they had failed to maintain the property in good repair and condition and that the security of the plaintiff had been lessened, diminished, depleted and impaired and that the plaintiff was entitled to accelerate the payment of the note or to foreclose the mortgage.

The defendant, Robert G. Forrester, further alleged that the loan was obtained as a disabled veteran's loan; that at the time the loan was granted the defendant was not physically able to operate the farm as a row crop farm and that such disability still exists; that the farm was purchased primarily as a permanent home and for stock grazing purposes to which it is best adapted and that all of the facts were thoroughly understood and agreed to by plaintiff at the time the loan was granted; that the plaintiff has accepted all payments due under the terms of the mortgage including taxes and insurance premiums and that they were not delinquent in any manner at the time the acceleration notice was given nor have they since been delinquent in any payments according to the terms of the note and mortgage.

4.

The defendant, Robert G. Forrester, is a disabled veteran of the United States of America and prior to and at the time of the negotiation of the loan he had been ordered by his physicians to reside on a farm and, in an effort to comply with the orders of his physicians, he entered into an agreement with the former owners of the farm to purchase it. When that agreement was entered into, he discussed the situation with the County Loan Committee of the Farmers Home Administration. The Committee inspected the farm and, after being fully advised of all facts, recommended that the loan be made, and the loan was consummated on April 23, 1948, as hereinbefore stated. At that time the defendants were residing on the farm and about the time the loan was consummated representatives of the Farmers Home Administration called on defendants and outlined a "Long-Time Farm and Home Plan" to be immediately inaugurated by defendants and completed in 1953. (Defendants' Exhibit No. 1.) The plan outlined appears upon its face to have been impossible of consummation. To illustrate, the Farmers Home Administration recommended that the farm be utilized as follows: 10 acres for pasture, 2 acres for truck crops, 20 acres for oats, 10 acres for corn and 2 acres for berries, and further recommended that the defendants stock the farm by placing thereon fifteen white-faced cattle and four dairy cows, or a total of nineteen head of cattle for a 10-acre pasture; that the defendants have one sow so that they could sell at least four pigs per year; that they maintain two-hundred hens and three-hundred broilers.

All of the testimony shows that the farm was not adapted to the growing of any row crops except berries and the growth of the berries would always depend upon weather conditions. Aside from truck patches and some berries as the weather permitted, the best use of the farm was for pasture and the production of hay. The plan also required the defendants to completely modernize the residence, including bathroom, septic tank, pressure water system and chlorinator, and also required medical examinations of the defendants every six months and for the spraying of "every possible mosquito breeding area;" that new shade trees should be placed in the front yard and new closets for upstairs bedrooms; that the house should be completely furnished including new gas range and water heater; that the defendants should consider plans for children to attend grade school full term each year and that their children should become members of 4-H clubs, future farmers, farm and home organizations and should have more books and magazines for home reading (incidentally, the defendants had and have no children).

An estimated cost of the improvements was $885, as shown by Defendants' Exhibit No. 2. The defendants in good faith undertook to comply with the terms of the "Plan" and Defendants' Exhibit No. 8 contains a list and the costs and dates of the improvements made by them. The total cost was $2,306.50, and these improvements were all made prior to the date of the notice of the acceleration of the indebtedness. Certain pictures were introduced showing the physical condition of the residence, barn, chicken house and outhouse and those pictures disclose that the improvements were, at the time the acceleration notice was given, in excellent condition. The planners also required the defendants to erect an outdoor privy, but at the same time demanded that the residence be completely modernized. The necessity for an outdoor privy in view of the requirement of a complete modernization of the residence is not disclosed.

Unfortunately, the defendant, Robert G. Forrester, had some difficulty with his neighbors and one of the neighbors, Marvin Beeks, a young man who makes his living by doing mechanical work at Fayetteville but who resides near the farm, testified that in his opinion the defendants had not utilized the land as a farm and that the defendant, Robert

G. Forrester, did not personally remain on the farm at all times. Practically the same testimony was given by Russell McMullen, another neighbor. The difficulty between Mr. McMullen and the father of the witness, Marvin Beeks, and the defendant grew out of the litigation over the attempt of the elder Beeks and McMullen to use a portion of the land of defendants for a road. Also, Mr. Ray Patten, a young man who lives near the defendants' farm and earns his living working at the Veterans' Hospital at Fayetteville, stated that he did not think the land was being operated as a farm, but he also testified that he had been employed by the defendants and had mowed 25 or 30 acres of the land for two or three years.

The disability compensation of the defendant, Robert G. Forrester, was discontinued in August, 1949, and in order to earn a living for himself and wife, the defendant, Cora L. Forrester, he was compelled to seek outside employment, but he continued to maintain his home on the land at all times and his wife constantly remained on the farm, with the exception of approximately one week each year when she visited some of her relatives. During the year 1948 the defendants had on the farm 2,630 chickens. In 1949 they had 4,500 chickens. In 1950 they had 3,850 chickens. In 1951 and 1952 they had only about 200. During all of the time, they have not only maintained their home there but have had at various times some cattle and hogs on the farm, to say nothing of four horses that were there for a few months.

The defendant, Robert G. Forrester, is a college graduate and, according to the plan of the Farmers Home Administration, he attended the College of Agriculture of the University of Arkansas and studied poultry production, broiler production, livestock judging and meat cutting. Unfortunately, he has been ill many times since 1949. At one time he was totally incapacitated and at home for a period of more than six months suffering from a broken leg and mangled ankle. In the meantime he has worked for the Ford Motor Company and other important industrial organizations. He was Post Engineer at Camp Chaffee, Arkansas, near Fort Smith, for several months and, during all of these times, he would return home for a stay of from one to three days during regular ten-day intervals and in that manner undertook to and did supervise, in cooperation with his wife, the operations of the farm. He was requested by the Farmers Home Administration to give up his employment at Camp Chaffee and to give all of his time to the farm. He complied with the request and remained on the farm during 1951 as long as his finances would permit and then sought other employment as heretofore mentioned.

The defendants are the Mortgagors and the covenants relied upon by the plaintiff as its authority for accelerating the date of the payment of the indebtedness have heretofore been set forth. It will be observed that in Clause 3 mortgagors covenanted to: "personally and continuously to use said property as a farm, and for no other purpose; at all times to maintain said property in proper repair and good condition; * * * promptly to effect such repairs to said property as Mortgagee may require; to institute and carry out such farming conservation practices and farm and home management plans as Mortgagee shall, from time to time, prescribe." The testimony discloses that the mortgagors have personally and continuously used the property as a farm. It has not been used for any other purpose and there is no doubt but that the property has at all times been maintained in proper repair and good condition. Repairs to the property, including the fences, have been maintained. The defendant, Robert G. Forrester, has not personally labored on the farm continuously, but his co-defendant, his wife, has been present continuously and, of course, has maintained the home there as a farm. It is true that no row crops have been planted or cultivated, but it is

likewise true that the farm is not suitable for row crop farming, but all the testimony reveals that it has been devoted to uses that are feasible and practical for the community. The defendant, Robert G. Forrester, is still a disabled veteran and has maintained his home on the property. There is no claim that he has permitted the soil to erode or deteriorate. Apparently the venture of growing chickens ended disastrously as is so often the case, but for that matter the same disaster would have resulted had the defendant been financially able to place nineteen head of cattle on a ten-acre pasture. It is a matter of common knowledge that more pasturage than the amount planned is required for nineteen head of cattle.

### 5.

Clause 1 of the covenants provides that the mortgagors shall pay before the same shall become delinquent all taxes and "encumbrances of every nature whatsoever which affect said property or mortgagee's rights and interest therein * * *, and promptly deliver to mortgagee, without demand, receipts evidencing such payments."

The testimony discloses that the taxes for the year 1949, payable in 1950, were not paid by mortgagors within the time provided by law, but their failure to pay the taxes arose because they thought those taxes had been paid and, immediately upon ascertaining that the taxes had not been paid, they reimbursed the plaintiff for the taxes that it had paid.

### 6.

Clause 2 of the covenants provides that the mortgagors shall provide and continuously maintain fire insurance policies and such other insurance policies as the mortgagee may from time to time require upon the buildings and improvements on the land. The insurance was duly provided and, prior to the date for the renewal of the insurance policy, the defendant, Robert G. Forrester, mailed a check for $53.40 to the Arkansas Farmers Mutual Insurance Company. The letter enclosing the check was erroneously delivered to another company and was not transmitted to the proper insurance company until November 17, 1950, which was a few days after the due date of the renewal premium and the plaintiff advanced the payment but, upon discovery of the error, the defendants promptly sent the plaintiff a check to reimburse it for the insurance. At that time the fire insurance was for $6,500 and, thereafter, no more errors were made in the payment of the bills, but for some reason the plaintiff conceived the idea that the insurance should be raised to $8,500 and that was done, with the payment by the defendants of the additional insurance cost.

After the suit had been filed, the defendants paid another premium on the $8,500 policy. Thus the taxes have been paid and the insurance maintained at all times by the defendants.

### 7.

Clause 13 of the covenants provides that the mortgagors did not have authority to lease or encumber the property or any interest therein without the consent of the mortgagee, and the plaintiff complains that the defendants during 1949 and a part of 1950 leased 37 acres of the land to Mr. McMullen for a pasture and that the defendants received approximately $100 rental. That is true, but the contract with McMullen did not in any wise interfere with the operation of the property as a farm and, in fact, the farm was not damaged in any particular by using a portion of it for pasture.

### 8.

The mortgage was drawn by plaintiff for the purpose of enabling it to take such steps as might be necessary to protect the security for the repayment of the loan. There is no claim on the part of the plaintiff that the land has deteriorated in value or that any erosion has occurred. The long-time plan, in referring to changes in cropping systems and crop rotations, provides: "All land to be left in grass except garden space." That suggestion or requirement was

fully met by defendants through the sowing of orchard grass and lespedeza seed. The pastures and land have been maintained and properly improved

Mr. Griff Wilson, a native of Washington County and admittedly familiar with property values, testified that the market value of the property at this time is $10,000. He further stated that the improvements now on the land enhanced its value by at least $2,000 and the testimony shows that the improvements referred to by Mr. Wilson were all placed on the land by these defendants prior to the date of the acceleration notice. Mr. Wilson further testified that in January, 1952, the land was worth more than it is at present but, notwithstanding that, its present value is $10,000. No one disputed that the land is worth that sum of money.

In the notice of acceleration, the plaintiff assigned as one of its reasons for accelerating the due date of the indebtedness that the defendants had permitted the Farm Bureau Cooperative Mill & Supply Company, Inc., to obtain a judgment, and the testimony also showed that Swift & Company obtained a judgment for approximately $140. It is admitted that these judgments were obtained against the defendants, but the property is the homestead of the defendants.

### 9.

The undisputed testimony shows that at this time the defendants are not in arrears and no payments of any kind are due the plaintiff on the debt. In fact, the defendants proceeded to pay and the plaintiff accepted the payment of $283.32 that was due on March 31, 1952, and, also, the defendants paid and the plaintiff accepted the payment of $283.32 that was due March 31, 1953, and, in addition to that, required or at least accepted from defendants premiums on the increased amount of insurance since this suit has been filed.

### 10.

As heretofore stated, the defendant, Robert G. Forrester, is a disabled veteran and, notwithstanding he has been unable to realize from the operation of the land money sufficient to meet the installments on the loan, pay the taxes and maintain insurance and make the improvements, he has by working at various times been able to meet all payments and at the same time add to the value of the plaintiff's security.

### 11.

In addition to the improvements heretofore mentioned, defendant erected new fences on the north and west boundaries of the farm, and 900 feet of new fence on the east boundary; he also had a sufficient supply of creosoted posts to complete the fencing of the farm, but, subsequent to receiving the notice of acceleration, he has made no attempt to complete the fencing or to make other substantial improvements pending the outcome of this litigation. In 1948, he spread 11,700 pounds of phosphate on the pasture land and each year thereafter spread organic fertilizer on said land. Moreover, each year defendant mowed the pastures, and cut and stacked substantial amounts of hay. He has also set out about eight peach trees on the farm. All of these improvements were made prior to the date of acceleration.

### Discussion

At the beginning of the trial, one of the attorneys for plaintiff stated the contentions of the plaintiff as follows:

"As the court knows, this case involves the complaint for foreclosure of 70 acres of land in Washington County. On April 15, 1948, the United States, acting through the Administrator for the Farmers Home Administration, made a loan to Mr. Robert G. Forrester and Cora L. Forrester, the defendants herein, to enable them to purchase a farm type home. This loan was made so that the terms complied with the Bankhead-Jones Act as set out in 7 U.S.C.A. 1003. I think we can simplify the issues if this is agreed as it appears in the record so far. The defendants in their answer ad-

mit making the note and the mortgage. They further admit the acceleration of the indebtedness on January 22, 1952. And they also admit in their answer a judgment of the Farm Bureau Cooperative Mill and Supply, Inc., entered on November 22, 1949, against them for the sum of $1471.26. They also admit the judgment taken against them in the Fayetteville Municipal Court by Swift & Company on August 2, 1950, for $140.00 and costs. I state that for the record because those judgments were sent up as part of the reasons for which the government thought foreclosure could be granted. It is our view that the case gets itself down, generally, as to the problem of whether or not Mr. Forrester operated the farm as a farm so as to comply with the Bankhead-Jones Act under which he got the loan. And that, I think, will be our main point of proof. We also will show in there probably some discrepancies as to payment of taxes and insurance. We will have about six witnesses. We don't mean by that that we are waiving the other breaches, such as allowing judgments to be taken against him to properly pay taxes and insurance."

The Bankhead-Jones Farm Tenant Act was enacted July 22, 1937, 50 Stat. 522, 7 U.S.C.A. §§ 1000–1005d, 1007, and 1008–1029.

The original act in Section 1(b) provided:

"Only farm tenants, farm laborers, sharecroppers, and other individuals who obtain, or who recently obtained, the major portion of their income from farming operations shall be eligible to receive the benefits of this title."

On June 22, 1944, 58 Stat. 293, 38 U.S.C.A. § 694e, the provisions of the act were extended to a veteran "to the same extent as if he were a farm tenant."

The terms of loans were set forth in Section 3 of the original act and, on August 14, 1946, the original section was amended by adding to Section 3(a) the following sentence:

"Loans may not be made for the acquisition or enlargement of farms which have a value, as acquired, enlarged, or improved, in excess of the average value of efficient family-type farm-management units, as determined by the Secretary, in the county, parish, or locality where the farm is located."

The original act, as well as the amendatory act, provided that the amount of the loan should be in an amount not in excess of the amount certified by the county committee to be the value of the farm.

The amendatory act made no changes in the "terms of loans," except that the rate of interest was raised from 3 to 3½ per centum per annum. Later, the rate of interest was raised to 4 per centum per annum by the Act of June 19, 1948, 62 Stat. 534.

The "terms of loans" as now set forth in 7 U.S.C.A. Section 1003(b) are identical with the "terms of loans" that the act provided for at the time the loan in question was obtained except for the change in the rate of interest from 3½ per centum to 4 per centum per annum.

The terms of loans, applicable to the instant case, are as follows:

"(b) The instruments under which the loan is made and security given therefor shall—

"(1) provide for the repayment of the loan within an agreed period of not more than forty years from the making of the loan;

"(2) provide for the payment of interest on the unpaid balance of the loan at the rate of 4 per centum per annum;

"(3) provide for the repayment of the unpaid balance of the loan, together with interest thereon, in installments in accordance with amortization schedules prescribed by the Secretary;

"(4) be in such form and contain such covenants as the Secretary shall prescribe to secure the payment of the unpaid balance of the loan, together with interest thereon, to protect the security, and to assure that the farm will be maintained in repair, and waste and exhaustion of the farm prevented, and that such proper farming conservation practices as the Secretary shall prescribe will be carried out;

"(5) provide that the borrower shall pay taxes and assessments on the farm to the proper taxing authorities, and insure and pay for insurance on farm buildings;

"(6) provide that upon the borrower's assigning, selling, or otherwise transferring the farm, or any interest therein, without the consent of the Secretary, or upon default in the performance of, or upon any failure to comply with, any covenant or condition contained in such instruments, or upon involuntary transfer or sale, the Secretary may declare the amount unpaid immediately due and payable, and that, without the consent of the Secretary, no final payment shall be accepted, or release of the Secretary's interest be made, less than five years after the making of the loan."

The covenants in the mortgage sought to be foreclosed have been set forth in Finding of Fact No. 2 and need not be repeated. Suffice it to say that the note executed by defendants provides that it was executed subject to the provisions of the Bankhead-Jones Farm Tenant Act, and the mortgage, in Clause 20 of the covenants, provided that, if the mortgagor failed to keep or perform any covenant, condition or agreement contained in the mortgage, the mortgagee (plaintiff) at its option had the right to declare the entire indebtedness secured by the mortgage to be immediately due and payable and to foreclose the mortgage.

█ It is the general rule that, where the agreement of the parties so provides, the principal sum secured by the mortgage may be declared due and payable immediately, with the consequent accrual of the right to foreclosure on default in the performance of any covenant or agreement contained in the mortgage. 59 C.J.S., Mortgages, § 495(4), p. 786.

In Johnson v. Guaranty Bank & Trust Company, 177 Ark. 770, at page 773, 9 S.W.2d 3, at page 4, the court said:

"A stipulation in a mortgage that, if the mortgagor shall fail to pay any note or installment of interest, or neglect to pay taxes or special assessments, the entire indebtedness shall become due, and payable, or that the mortgagee may at his option declare it to be due and payable, is a legal and valid provision."

██ However, equitable principles may be invoked to relieve a mortgagor from acceleration of the maturity of the debt and from foreclosure of the mortgage. 59 C.J.S., Mortgages, § 495(6), p. 794. The acceleration clause is not a forfeiture clause but in effect is a stipulation for a period of credit on condition.

█ A court of equity will always relieve against the effect of the accelerating provision, where the default of the debtor is the result of accident or mistake or when it is procured by fraud or other inequitable conduct of the creditor. Johnson v. Guaranty Bank & Trust Company, supra; Harrell v. Perkins, 216 Ark. 579, 226 S.W.2d 803. In the latter case, the court, at page 582 of 216 Ark., at page 805 of 226 S.W.2d in referring to an annotation in 70 A.L.R. 993, said:

"It is held, apparently without dissent, that a court of equity has the power to relieve a mortgagor from the effect of an operative acceleration clause, when the default of the mortgagor was the result of some unconscionable or inequitable conduct of the mortgagee."

In Mitchell and Shaw v. Federal Land Bank of St. Louis, Missouri, 206 Ark. 253, at page 264, 174 S.W.2d 671, at page 647, the court said:

"There is a tendency on the part of courts of equity to relieve mortgagors from the hardships of acceleration of maturities."

In 59 C.J.S., Mortgages, § 495(6), p. 794, it is said:

"In determining whether to relieve against acceleration the court may consider the conduct of the parties, the amount paid in reduction of the debt, and the improvements made on the property by the mortgagor. Equity will relieve the mortgagor where the mortgagee has been guilty of unconscionable conduct, as where the default is caused or induced by the mortgagee's acts or declarations. Equity may also relieve against acceleration where default results from accident or mistake, or where strict enforcement of acceleration would impose an unconscionable hardship on the mortgagor and give the mortgagee an unconscionable advantage. The mortgagor has been relieved where the default was the result of a mistake of law made in good faith and the mortgagee was not injured * * *."

■ It will be noted that the plaintiff, in stating its contentions at the beginning of the trial, said that it would show "probably some discrepancies as to the payment of taxes and insurance." The facts show that the failure of the defendants to pay the taxes for the year 1949 and the failure to pay the renewal insurance premium at one time was occasioned by a mistake or inadvertence. There is no question but that the defendants were acting in the utmost good faith in reference to the payment of the taxes and the renewal of the insurance, and the plaintiff is not entitled to accelerate the maturity of the note because of those acts.

Aside from the provision in the law and the covenant in the mortgage requiring the borrower to pay taxes and maintain insurance on the buildings, the "terms of loans" set forth in the statute and carried forward in the covenants in the mortgage are intended "to protect the security and to assure that the farm will be maintained in repair, and waste and exhaustion of the farm prevented." There can be no doubt but that the security of the plaintiff is at this time more valuable than it was the day the mortgage was executed. The loan was for the entire purchase price of the farm, and it is now worth on the market at least $10,000. The farm has been maintained in repair and waste and exhaustion has been prevented by the defendants, but the plaintiff further complains that the defendants have not followed "such proper farming conservation practices as the Secretary has prescribed" and that the defendants have failed to personally and continuously use the property as a farm and have encumbered the farm by allowing certain judgments to be entered against them.

At the time the loan was granted to the defendants, the defendant, Robert G. Forrester, was drawing disability compensation, and it must have been in the contemplation of the parties that he would continue to draw such compensation. The Farmers Home Administration promulgated certain rules and regulations concerning this type of loan. Volume 6, 1949 Edition, Code of Federal Regulations, contains the regulations that were in force at the time the loan was made.

In Section 311.44 it is provided:

"Tenant purchase, farm enlargement or farm development loans may be made or insured to enable eligible veterans drawing disability pensions to acquire, enlarge or improve farm units of sufficient size to meet the farming capabilities of such veterans and afford them income which, together with their pensions, will enable them to meet living and operating expenses and the amount due on their loans."

Practically the same provision is found in Section 311.3. Section 316.5 provides that preference shall be given the applications of veterans for such loans.

In Section 321.1 it is provided that either efficient family-type farm-management units would be acquired or improved or undersized or under-improved farms will be enlarged or improved into efficient family-type farm-management units and that: "the one exception to this requirement will be in the case of disabled veterans who, under certain conditions, may acquire, enlarge or improve farms which are less than efficient family-type farm-management units."

Section 321.3 of the regulations sets forth standards for the selection of farms. It is there provided that farms that are less than efficient family-type farm-management units may be acquired provided that: "(b) the farm has the capacity to produce an annual income which, together with the veteran's disability pension, will enable him to meet his normal obligations. These obligations will include family-living expenditures which will maintain acceptable standards of living for the veteran and his family, as well as operating expenses, and amounts due on his loan."

It is admitted that at the time the loan was negotiated the defendant, Robert G. Forrester, was drawing disability benefits and that he continued to draw such benefits until in August 1949. No complaint is made that he had not fully complied with all requirements up to the time that his disability compensation was discontinued. When those payments were discontinued, he was compelled to seek other means of earning money sufficient to provide a living for himself and wife and to continue his improvements on the land. In this connection it should be remembered that the defendants paid for the improvements on the farm from their personal funds and not from any of the proceeds of the loan.

■ Notwithstanding the payment of the disability benefits was discontinued, he continued to live on the farm and that was and is his home. His wife was there looking after the farm at all times during the necessary absence in his effort to increase his earnings, and it cannot rightfully be said that the defendants failed to personally and continuously use the property as a farm.

■ Section 372.6 of the regulations, supra, provides that: "circumstances may arise, such as death within the family, poor health, abandonment, and so forth, which may make it necessary to lease the farm," and that, therefore, the State Director may authorize the borrower to lease the farm or any part thereof. It appears that the borrowers leased a portion of the farm to a Mr. McMullen without the express consent of the State Director, but no claim is made by the plaintiff that the leasing in any wise injured the farm, and it is a matter of common knowledge that the grazing of cattle on a farm does not usually result in waste or depreciation of the value of the farm.

■ The plaintiff further complains that certain judgments were rendered against the defendants, and the rendition of the judgments gave the plaintiff the right to accelerate the maturity of the note. The mortgage says nothing about judgments but does provide that "encumbrances of every nature whatsoever which affect said property or mortgagee's rights and interest therein under this mortgage or the indebtedness hereby secured" shall be a violation and grounds for acceleration of the maturity date of the indebtedness. The judgments in no wise constitute encumbrances on the farm. The farm is the homestead of the defendants and contains less than 80 acres. Section 3 of Article 9 of the Constitution of the State of Arkansas provides:

"The homestead of any resident of this State who is married or the head of a family shall not be subject to the lien of any judgment, or decree of any court, or to sale under execution or other process thereon, except such as may be rendered for the purchase money or for

specific liens, laborers' or mechanics' liens for improving the same, or for taxes, or against executors, administrators, guardians, receivers, attorneys for moneys collected by them and other trustees of an express trust for moneys due from them in their fiduciary capacity."

Section 4, supra, provides that the homestead outside any city, town or village owned and occupied as a residence shall in no event be reduced to less than 80 acres without regard to value.

Therefore, the judgments constitute no encumbrance against the farm and do not "affect said property or mortgagee's rights and interest therein."

Such violations of the covenants contained in the mortgage as have been committed by defendants are technical. They are not substantial and do not in any wise impair the security of the plaintiff. The facts disclose that the veteran defendant is now and has been plagued with various types of illness, but, notwithstanding this, the home has been maintained on the farm, the security has been improved and all payments have been made. The defendants were not in default at the time the suit was filed nor are they now in default, and to allow a foreclosure of the mortgage at this time will result in a hardship to the defendants and is not required as a protection of the security of the plaintiff.

The plaintiff has argued that the defendants are enjoying the benefits of a low rate of interest on the loan and have failed to cooperate fully with the officials and representatives of the Farmers Home Administration. Cooperation is a two-way street and the very term implies that the parties shall work together to accomplish the objective of the undertaking. The plaintiff does not claim that the defendants committed a fraud in procuring the loan and it is not denied that the repayment of the loan is well secured. There may have been some slight disagreements between the defendants and certain representatives of the plaintiff, and these disagreements may have influenced to some extent the action of the State Director in reaching the decision to give the notice of acceleration of the maturity date of the debt but, to permit a foreclosure of the mortgage at this time, would result, in the opinion of the court, in imposing on the defendants an unconscionable hardship and would give the plaintiff an unconscionable advantage.

The attorneys for the respective parties have not called to the court's attention any foreclosure case that has arisen under the Bankhead-Jones Farm Tenant Act, and the court has been unable to find such a case. However, the plaintiff argues that it is absolutely necessary that the court permit a foreclosure of the mortgage in this case because of its importance in the administration of the Bankhead-Jones Farm Tenant Act, as amended. As heretofore stated, such covenants as are relied upon by plaintiff are valid and the conclusion reached by the court in the instant case does not in any manner question the validity of the covenants or the rights of plaintiff thereunder in a proper case. But the court does hold that the facts here do not authorize the plaintiff to accelerate the due date of the indebtedness. Therefore, the complaint of the plaintiff should be dismissed.

### Conclusions of Law

1.

The court has jurisdiction of the parties and the subject matter of this cause. 28 U.S.C.A. § 1345.

2.

The complaint of the plaintiff and the answer and cross-complaint of the defendant, Farm Bureau Cooperative Mill & Supply, Inc., should be dismissed for want of equity.